STATE OF NORTH CAROLINA v. ALTON RAY YELLORDAY AND RICKY NELSON

No. 81

(Filed 12 July 1979)

### 1. Robbery § 4.3— armed robbery—sufficiency of evidence

The State's evidence was sufficient to support a charge of armed robbery of the prosecutrix and the verdict of the lesser included offense of common law robbery where the prosecutrix testified that defendants smashed through her bedroom door with an ax, demanded money, and ransacked the room hunting for it; at that time she had a black pocketbook containing about two dollars behind her bed; when she tried to escape from the house one defendant grabbed her and carried her out of the house, threw her down on the ground, and brutally assaulted her; the next morning she found the pocketbook in the middle of the road in front of her house; and defendants took about two dollars of her money.

2. **Criminal Law § 34.7— armed robbery—evidence defendants had earlier robbed victim—relevancy**

Evidence that defendants had robbed the male victim of his social security check on 3 January was relevant to show that when defendants entered the victims' residence on 3 February their purpose was to rob the male victim of his monthly check where (1) both robberies occurred at the victims' residence; (2) the male victim was the sole victim in the first robbery and the principal victim in the second; (3) defendants acting together were the sole perpetrators of the two robberies; and (4) both offenses, occurring within a month of each other, were committed on the 3rd of the month, the day on which the male victim received his monthly social security check.

3. **Criminal Law § 99.8— questions by trial court—no expression of opinion**

The trial court's questions to the disabled, arthritic 61-year-old robbery victim were solely for the purpose of clarifying his confused and sometimes conflicting testimony and did not constitute an expression of opinion on the evidence.

4. **Criminal Law § 89.5— minor variation in corroborating testimony**

Variation between a robbery victim's testimony that money was taken from her pocketbook which she had behind her bed and a deputy sheriff's testimony that the victim told him money was taken from a dresser top was minor and merely raised an issue of credibility for the jury where the victim was consistent in her testimony that defendants took two dollars and a few cents from her.

5. **Criminal Law §§ 73.2, 102.5— questions to unavailable witness not hearsay—improper questions by prosecutor—harmless error**

In this armed robbery prosecution, testimony by officers that they asked an eyewitness who was not present at trial certain questions about the occurrence and identity of the robbers, that the eyewitness answered their questions, and that they had later unsuccessfully tried to locate the eyewitness to insure his presence at trial was not inadmissible as hearsay since the officers never repeated any response to their questions and the questions themselves are not evidence. However, the district attorney's questions to the officers were improper since he was trying to imply that had the eyewitness been present his answers would have paralleled and corroborated testimony by the victims, but such conduct by the district attorney did not constitute prejudicial error where it could not have affected the verdict.

Justices BRITT and BROCK did not participate in the consideration or decision of this opinion.

APPEALS by defendants from the judgments of *James, J.,* 25 April 1977 Criminal Session of the Superior Court of HALIFAX, docketed and argued as case No. 83 at the Spring Term 1978.

Defendant Yellorday (age 18) and defendant Nelson (age 17) were separately indicted and jointly tried for the first-degree

burglary of the dwelling of Ned and Emma Powell and the armed robbery of Emma. Each was convicted of first-degree burglary and common-law robbery, and appeals from the sentences imposed. The State's evidence, which consisted of the testimony of the victims and four law enforcement officers, tended to show:

Ned Powell, 61 years old, and Emma, his wife, 59 years old, live in a modest frame house in Lincoln Heights in the town of Roanoke Rapids. Disabled by arthritis, Ned's sole income is a social security check of $118.00, which he receives on the third day of each month.

After dark, around 7:30 p.m. on 3 February 1977, Ned, Emma, and their guest Sidney Freeman were seated in the Powell's bedroom near the wood heater when they heard a noise "like something hit the front door." An ax blade then split the bedroom door, breaking it open, and defendant entered the room. Defendant Nelson told Freeman that he was not the one they wanted and ordered him to lie motionless on the bed. He then demanded that Ned tell him "where the goddamn money was at." When Ned denied that he had any money Nelson grabbed him and removed from his pocket the $62.00 which remained from the proceeds of the social security check he had received that day. Nelson then hit Ned "beside his head and knocked him out." After that defendants "ranshacked the house," emptying bureau drawers and throwing clothes from the wardrobe on the floor. When Emma attempted to flee the house defendant Yellorday grabbed her and carried her outside. There he threw her on the ground and called to Nelson that "if he wanted some . . . he could come on and get it." When Nelson did not respond to the call Yellorday committed an act of sodomy upon Mrs. Powell.

While Yellorday had Emma outside, two men (identified in the record only as "the woodmen") arrived at the Powell residence in a pickup truck with a load of wood, and defendants fled. The woodmen were bringing the load of wood Ned had ordered to be delivered after he had received his social security check. When one of the men entered the house he found Ned in a dazed condition. While Ned was trying to tell him about the robbery Emma came in "crying and dirty," saying that she had been raped. The woodmen summoned the law enforcement officers and remained parked in front of the house until the sheriff and his deputies arrived.

In reporting to the officers what had happened, both Ned and Emma told them that night, and again on the following morning, that they knew the two defendants well; that defendants lived down the street from them in "The Heights" and passed the Powell home every day; that they recognized defendants as soon as they broke through the door despite the strip of stocking each had tied around his head to mask his eyes. Emma said that they had seen the defendants that same day as she and Ned went to the grocery store after the check had come. She also testified that she had known both defendants since they were babies and "their mammas and their daddys too"; that one was the son of Shirley Yellorday and the other was Mary Jane's boy, Ricky.

When defendants broke into the Powell's bedroom Emma's black pocketbook, which contained two or three dollars, was behind her bed. The next morning she found the pocketbook in the middle of the street in front of her house.

Ned testified, over defendants' objection, that the robbery on February 3rd was the second time defendants had robbed him; that on 3 January 1977 they had come on his porch and taken his social security money from him, but he didn't report the robbery because he was afraid they would hurt him and he "wasn't able to fight anybody."

The testimony of the four law enforcement officers, Sheriff W. D. Bailey and his deputies, Ray Garner, E. C. "Fab" Warren, and Charles E. Ward, was substantially the same. Deputy Garner was the first to arrive at the scene after the robbery. He found Emma coming out of the house with a pair of torn panty hose "hanging down around her knees." Because she was distraught and crying he placed her in his car, radioed for assistance, and tried to calm her before taking her to the hospital. The deputy said that when Emma was asked if she could identify the invaders she said she knew them but "couldn't call their names right at that time"; that they were two blacks who lived in Lincoln Heights—one was Mary Jane's boy Ricky and the other, Shirley Yellorday's son, and that it was the defendant Yellorday who had "raped" her.

When Sheriff Bailey and Deputy Warren responded to Deputy Garner's call they found the Powell's ax in the front yard and observed gaping holes in both the front door and the bed-

room door. For the purpose of corroborating Ned and Emma each deputy testified as to the statements the Powells made during the investigation of the charges against defendants.

Deputies E. C. Warren and Charles E. Ward stated that the next morning they conducted a further investigation at the Powell home and took additional statements from the Powells and Freeman. Both officers said they had been present at the defendants' preliminary hearing in the district court and had heard Ned and Emma identify defendants as the persons who broke into their bedroom, attacked and robbed them. In explanation of Freeman's failure to testify as a witness for the State, these officers said that, despite their diligent search, they had been unable to find Freeman since the preliminary hearing.

When the State rested its case, defendants announced they would offer no evidence and moved to dismiss the charges against them. The motions were denied, and the jury found each defendant guilty of first-degree burglary and common-law robbery. Each received a sentence of life imprisonment on the count of burglary and, on the charge of robbery, a consecutive sentence of eight to ten years.

*Rufus L. Edmisten, Attorney General, and Charles J. Murray, Assistant Attorney General, for the State.*

*Dwight L. Cranford for Ricky Nelson, defendant.*

*H. P. McCoy, Jr., for Alton Ray Yellorday, defendant.*

SHARP, Chief Justice.

[1] We consider first defendants' assignment of error No. 6, that the trial judge erred in denying their motions for judgments as of nonsuit at the close of the State's evidence. In a criminal case the rule is that, upon a motion to nonsuit, the court must consider the evidence "in the light most favorable to the State, all contradictions and discrepancies therein must be resolved in its favor and it must be given the benefit of every reasonable inference to be drawn from the evidence." *State v. Cutler,* 271 N.C. 379, 382, 156 S.E. 2d 679, 681 (1967). Under this rule, defendants concede that the State's evidence withstands their motion to dismiss the charge of burglary. They argue, however, that there was not suf-

ficient evidence to go to the jury on the charge that defendants robbed Emma Powell.

For some reason, unfathomable to us, the district attorney chose to charge defendants with feloniously taking two dollars from the person, dwelling and presence of Emma Powell by the use of a dangerous weapon, an ax, whereby her life was endangered without making a similar charge against defendants with reference to the taking of $62.00 from the person of Ned Powell. Notwithstanding, we hold that the testimony of Emma on direct examination, standing alone, is sufficient to support both the charge of armed robbery and the verdict of the lesser included offense of common-law robbery. "Robbery at common law is the felonious taking of money or goods of any value from the person of another, or in his presence, against his will, by violence of putting him in fear . . . . It is not necessary to prove both violence and putting in fear—proof of *either* is sufficient. (Citations omitted.)" *State v. Moore*, 279 N.C. 455, 457, 183 S.E. 2d 546, 547 (1971). *Also see State v. Bailey*, 278 N.C. 80, 178 S.E. 2d 809 (1971), *cert. denied* 409 U.S. 948 (1972).

Emma testified that defendants smashed through the bedroom door with an ax, demanded money, and ransacked the room hunting for it. At that time she had a black pocketbook containing about two dollars behind her bed. When she tried to escape from the house defendant Yellorday grabbed her and carried her out of the house, threw her down on the ground, and brutally assaulted her. The next morning she said she found the pocketbook in the middle of the road in front of the house. The clear implication is that one of the defendants took the pocketbook, rifled it and then discarded it. However, even if the pocketbook were empty, the circumstances of its taking constitutes robbery.

On cross-examination Emma said that neither of the defendants ever took any money from her. Construing this statement in the light of defendants' actions after they burst into the Powells' bedroom, we deduce that Emma was saying that defendants did not take money from her person as they had done from the person of Ned. In any event, this statement does not bear upon the motion for nonsuit. "Contradictions and discrepancies are for the jury to resolve and do not warrant nonsuit." *State v. McKinney,*

288 N.C. 113, 117, 215 S.E. 2d 578, 581 (1975). Defendants' assignment No. 6 is overruled.

[2] Defendants' first assignment challenges the admissibility of the testimony of Ned and Emma Powell that on 3 January 1977, the day Ned received his check from the Social Security Disability Program, defendants came upon the Powells' front porch and robbed Ned of the proceeds of that check, and that this crime was not reported to the police because of Ned's fear of reprisals by defendants. Defendants argue that this incident was "another distinct, independent, or separate offense" and this evidence was erroneously admitted to their prejudice. This contention is without merit.

In a criminal prosecution "[e]vidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact it will not be excluded merely because it also shows him to have been guilty of an independent crime." *State v. Stegmann*, 286 N.C. 638, 652, 213 S.E. 2d 262, 272, *death sentence vacated*, 428 U.S. 902 (1975); *State v. McClain*, 282 N.C. 357, 361, 193 S.E. 2d 108, 111 (1972); 1 Stansbury's N.C. Evidence, § 91 (Brandis Rev. 1973). Thus, evidence revealing the commission of an independent offense is admissible "when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one . . . tends to prove the crime charged and to connect the accused with its commission"; or, when such evidence discloses acts or declarations tending to prove that the accused possessed a specific intent or mental state which is an essential element of the crime charged. *State v. Hunter*, 290 N.C. 556, 573-75, 227 S.E. 2d 535, 545, *cert. denied*, 429 U.S. 1093 (1976).

The Powells' testimony regarding the January robbery was properly admitted under the foregoing principles. When the January robbery and the February robberies are considered together their interrelation is clear: (1) Both robberies occurred at the Powell residence; (2) Ned Powell was the sole victim in the first robbery, the principal victim in the second; (3) defendants acting together were the sole perpetrators of the two robberies; and (4) both offenses, occurring within a month of each other,

were committed on the 3rd of the month, the day on which Ned generally received his monthly social security check. Manifestly, the challenged testimony is relevant to show that when defendants entered the Powell residence on 3 February 1977 their purpose was to rob Ned of the proceeds of his monthly check. Assignment No. 1 is not sustained.

[3] Defendants next contend that the trial court, "by its prolonged interrogation of the witness, Ned Powell," expressed an opinion in violation of G.S. 1-180. A trial judge's questions, propounded to a witness to clarify his confusing or contradictory testimony, do not constitute an expression of opinion unless a jury could reasonably infer that the questions intimated the court's opinion as to the witness's credibility, the defendants' guilt, or as to a factual controversy to be resolved by the jury. State v. Tinsley, 283 N.C. 564, 196 S.E. 2d 746 (1973); 4 Strong's N.C. Index 3d, Criminal Law, §§ 99.8, 99.9 (1976). From the record in this case it is crystal clear that the questions which Judge James asked Ned were solely for the purpose of clarifying his confused and sometimes conflicting testimony. The jurors, who heard the disabled, arthritic 61-year-old man "get it straight," only to be confused again by the next set of questions, were bound to have understood (and sympathized with) the trial judge's efforts to "see if [he could] clear this up." We are satisfied beyond peradventure that no one could reasonably infer from the exchanges between the judge and Ned Powell that the judge was expressing an opinion as to what facts had been proven. This assignment, therefore, is overruled.

[4] Defendants' third assignment is that the trial judge erred in overruling their motion to strike certain portions of the testimony of Deputy Sheriff E. C. Warren which was admitted solely for the purpose of corroborating Emma Powell. Warren testified that when he spoke with Emma shortly after 7:30 p.m. on 3 February 1977 she was very excited, crying, and she had dirt on her back and on her clothing; that she told him, inter alia, she had been robbed and molested by "a boy named Ricky" and "by Shirley's boy," that they "took two dollars and a few cents from her," and that the money "was on the dresser."

Defendants argue that the foregoing statements were erroneously admitted because they did not corroborate Emma's

testimony. On direct examination Emma stated that she had "two or three dollars" in a black pocketbook behind her bed when defendants broke into the bedroom and that the next morning she found the pocketbook in the middle of the road in front of the house. On cross-examination she said that Ricky Nelson never put his hands on her, that Yellorday was the one who abused her sexually, and that neither took any money from her but they did take it from her husband.

The rule of law applicable to Assignment No. 3 has been stated as follows: "If a prior statement of a witness, offered in corroboration of his testimony at the trial, contains additional evidence going beyond his testimony, the State is not entitled to introduce this 'new' evidence under a claim of corroboration . . . . However, if the previous statements offered in corroboration are generally consistent with the witness' testimony, slight variations between them will not render the statements inadmissible. Such variations affect only the credibility of the evidence which is always for the jury." *State v. Brooks*, 260 N.C. 186, 189, 132 S.E. 2d 354, 356-57 (1963). *See State v. Carter*, 293 N.C. 532, 238 S.E. 2d 493 (1977). Furthermore, when portions of the prior statements are competent as corroborating evidence and other parts are not, it is the responsibility of the party objecting to specify the objectionable parts and move to strike it alone. The court is under no duty to separate the good from the bad. *State v. Pope*, 287 N.C. 505, 215 S.E. 2d 139 (1975); 4 Strong's N.C. Index 3d *Criminal Law*, § 89.4 (1976).

The record in this case will not support defendants' contention that the statements to which Deputy Warren testified were "new" evidence introduced under a claim of corroboration. In her testimony on both direct and cross-examination Emma repeatedly identified defendants as the individuals who broke into her home on 3 February 1977. Whether her "two or three dollars" were taken from the dresser or carried away in her black pocketbook, Emma was consistent in her testimony that "the two boys took two dollars and a few cents from her . . . ." This variation between Deputy Warren's statement and Emma's testimony is minor and merely raised an issue of credibility for the jury.

As to Emma's testimony that neither defendant took any money from her but they took money from Ned, we have hereto-

fore noted our conviction that, when considered in relation to the manner in which defendants robbed Ned, Emma was merely saying that she herself had no money on her and that defendants did not take her two to three dollars from her person. Deputy Warren's testimony was properly admitted in evidence; its probative value was for the jury.

Finally, with reference to Assignment No. 3, we note that at no time during Warren's testimony with reference to the statements Emma made to him did defendants ever object on the ground that the statements did not corroborate her testimony. The one time defendants stated the ground for an objection it was, "This testimony has been previously covered." Assignment No. 3 is overruled.

[5] Under Assignment No. 5 defendants challenged the admission of the testimony of deputies Ward and Warren regarding prior conversations had with Sidney Freeman, an eyewitness to the episode at the Powell residence on the night of 3 February 1977, who was not present at the trial. The officers testified, over defendants' general objections, that they had spoken with Freeman on the morning after the robbery and later at the preliminary hearing in District Court. At both times the officers queried Freeman about the occurrence and the identity of the invaders. The deputies did not testify to the content of any statements attributable to Freeman; instead, they limited their testimony to a repetition of the questions they asked him and the statement that he answered the questions. Warren and Ward also described their fruitless efforts to later locate Freeman in order to insure his presence at trial.

Defendants' argument that the testimony complained of is inadmissible as hearsay is without merit for the officers never repeated Freeman's responses to their questions, and the questions themselves are not evidence. However, by asking those questions the district attorney was cleary trying to imply that had Freeman been present his answers would have paralleled and corroborated Ned and Emma's testimony. Such tactics were improper. The court should have sustained defendants' first objection to this line of questions and ended them then and there. Notwithstanding, when this episode is considered in relation to the whole trial we are convinced that the unanswered questions could not have affected the verdict.

Defendants' remaining assignments of error (Nos. 6, 7, 8 and 9) relate to the charge, which—when read contextually—discloses no prejudicial error. We therefore overruled these assignments without discussion.

In the record of defendants' trial we find no prejudicial error.

No error.

Justices BRITT and BROCK did not participate in the consideration or decision of this opinion.